*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **OWENS-ILLINOIS, INC.** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 05 CV 2873 (LLS)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BTR plc,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT BTR PLC'S MOTION FOR SUMMARY JUDGMENT</u>

### REDACTED

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................. 1

**BACKGROUND** ......................................................................................... 5

    A.    The SDA .................................................................................. 5

    B.    Pre-Closing Conduct of the CPET Business; Owens' Due Diligence and BTR's Disclosures to Owens ..................................................... 7

    C.    Post-Closing Conduct of the Business by Owens:  Prejudice, Failure to Mitigate, and Late Notice ..................................................... 10

        1.    "OI Initiatives:" Owens starts selling infringing products without a license ..................................................... 10

        2.    Owens receives and rejects settlement offers from CCS ...................... 12

        3.    All infringement and damages claimed in the CCS Matter were for Owens/CPET's sales of CPTX-312 containers without a license .......... 14

        4.    Owens enters into settlement agreement with the wrong party, Chevron, and voluntarily takes actions that forfeit defenses to CCS's claim ..................................................... 15

        5.    The court in the CCS Matter rules that Chevron has no rights that cover CPTX-312 ..................................................... 17

        6.    Owens settles the CCS Matter and pays a "litigation premium" in respect of CCS's claim of willful infringement ................................ 17

**ARGUMENT** .............................................................................................. 19

    A.    Owens' failure to provide notice of the CCS Matter as promptly as practicable caused material prejudice to BTR .................................... 20

    B.    Owens breached the SDA by settling with Chevron without notifying BTR...... 23

    C.    Owens failed to take reasonable and prudent actions to mitigate losses in the CCS Matter .................................................... 25

    D.    CPET's conduct of the business at the time of Closing did not include selling CPTX-312 containers and did not give rise to any Losses ...................... 25

    E.    Owens waived any alleged breach of warranty with respect to the CCS Matter.................................................... 29

    F.    Owens cannot be indemnified for its own willful infringement .......................... 31

**CONCLUSION** .......................................................................................... 32

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adirondack Transit Lines, Inc., v. United Transp. Union, Local 1582,*
    305 F.3d 82 (2d Cir. 2002)................................................................................19

*Am. Ins. Co. v. Fairchild Indus., Inc.,*
    56 F.3d 435 (2d Cir. 1995)........................................................................20, 21, 22

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................19

*Austro v. Niagara Mohawk Power Corp.,*
    66 N.Y.2d 674, 496 N.Y.S.2d 410 (1985) ......................................................31

*Beatrice Foods Co. v. New England Printing & Lithographing Co.,*
    923 F.2d 1576 (Fed. Cir. 1991).......................................................................31

*Biondi v. Beekman Hill House Apartment Corp.,*
    692 N.Y.S.2d 304 (1st Dep't 1999) ...............................................................31

*Boyd v. Schildkraut Giftware Corp.,*
    936 F.2d 76 (2d Cir. 1991).............................................................................23

*Bush v. Fordham Univ.,*
    452 F. Supp. 2d 394 (S.D.N.Y. 2006).............................................................19

*Carlson Mktg. Group, Inc. v. Royal Indem. Co.,*
    517 F. Supp. 2d 1089 (D. Minn. 2007)...........................................................31

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)......................................................................................19

*Creative Waste Mgmt., Inc. v. Capitol Envtl. Services, Inc.,*
    458 F. Supp. 2d 178 (S.D.N.Y. 2006).............................................................19

*Crown Cork & Seal Tech. Corp. v. Cont'l PET Tech. Inc.,*
    232 F. Supp. 2d 294 (D. Del. 2002)...................................................16, 17, 22

*Davis v. New York,*
    316 F.3d 93 (2d Cir. 2002)............................................................................19

*Deligiannis v. Pepsico, Inc.,*
    757 F. Supp. 241 (S.D.N.Y. 1991) ................................................................25

*Drummond v. Morgan Stanley & Co., Inc.,*
    No. 95 Civ. 2011DC, 1996 WL 631723 (S.D.N.Y. Oct. 31, 1996)....................25

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

*Elite Licensing, Inc. v. Thomas Plastics, Inc.,*
  250 F. Supp. 2d 372 (S.D.N.Y. 2003)................................................................23

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)....................................................................29, 30

*Hooper Assoc., Ltd. v. AGS Computers, Inc.,*
  74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989)..............................................26

*Int'l Mineral & Chem. Corp. v. Avon Prods., Inc.,*
  889 S.W.2d 111 (Mo. Ct. App. 1994)..............................................26, 27

*Lewis v. Cigna Ins. Co.,*
  234 F.3d 1262 (2d Cir. 2000).................................................................24

*Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.,*
  269 F. Supp. 2d 206 (S.D.N.Y. 2003)....................................................25

*Parker v. Chrysler Corp.,*
  929 F. Supp. 162 (S.D.N.Y. 1996) ........................................................19

*Robertson v. Ongley Elec. Co.,*
  146 N.Y. 20 (1895)................................................................................26

*Rogath v. Siebenmann,*
  129 F.3d 261 (2d Cir. 1997)...................................................................29

*TLC Beatrice Int'l Holdings, Inc. v. CIGNA Ins. Co.,*
  No. 97 Civ. 8589 (MBM), 2000 WL 282967 (S.D.N.Y. Mar. 16, 2000) ..............24

*Unigard Sec. Ins. Co. v. North River Ins. Co.,*
  4 F.3d 1049 (2d Cir. 1993).....................................................................21

*Unigard Sec. Ins. Co. v. North River Ins. Co.,*
  79 N.Y.2d 576, 584 N.Y.S.2d 290 (1992) ...........................................21

*Vigilant Ins. Co. v. Bear Stearns Cos., Inc.,*
  10 N.Y.3d 170, 855 N.Y.S.2d 45 (2008) ..............................................24

*Wainco Funding v. First Am. Title Ins. Co. of N.Y.,*
  219 A.D.2d 598, 631 N.Y.S.2d 81 (2d Dep't 1995)..............................20

## STATUTES

35 U.S.C.§ 284................................................................................14, 28

## RULES

FED. R. CIV. P. 56(c)(2)..............................................................................19

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Defendant BTR plc ("BTR"), by its attorneys, Paul, Hastings, Janofsky & Walker LLP, submits this memorandum of law in support of its motion for summary judgment dismissing the complaint on the ground that plaintiff Owens-Illinois, Inc. ("Owens") has no right to indemnification as a matter of law.

## PRELIMINARY STATEMENT

On April 30, 1998, Owens purchased a group of packaging companies, including Continental PET Technologies, Inc. ("CPET"), from BTR. The transaction occurred pursuant to a Share Disposition Agreement ("SDA") entered into by the parties. Both sides agree that the terms of the SDA, which were negotiated at length by two highly sophisticated companies represented by high-paid counsel and financial advisors, govern the present dispute. Neither side argues that the SDA terms relevant to this motion are ambiguous. The material facts are not in dispute and this case is ripe for decision on summary judgment.

Owens seeks indemnification under the SDA for approximately $54 million it claims to have incurred with respect to three patent infringement claims, less a $35 million contractual deductible, for a total of approximately $19 million. Owens says it paid over $39 million, including $25 million in settlement costs and $14 million in attorneys' fees and other expenses, for just one of these claims, the "CCS Matter." The CCS Matter was filed in April 1999 by a company called Crown Cork & Seal with respect to plastic bottles sold containing an oxygen scavenging material called CPTX-312, which CCS alleged infringed U.S. Patent No. 5,021,515 (the "'515 patent"). All of BTR's grounds for summary judgment are directed to the CCS Matter. If Owens is not entitled to indemnification with respect to that matter, this entire action must be dismissed because the amounts Owens seeks with respect to the other two claims combined fall well below the $35 million contractual threshold.

The indemnification the parties agreed to in the SDA is not unlimited. It has important

1

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

contractual limitations that protect the indemnitor, in this case BTR.  These include the requirement of prompt notice, the obligation to avoid engaging in prejudicial conduct prior to giving notice, the prohibition on entering into any third party settlements without first notifying and obtaining consent from the indemnitor, and the obligation to take all reasonable steps to mitigate purported losses.  Owens clearly and indisputably violated each of these provisions:

- Owens failed to give notice of the CCS Matter for more than two years, which it has admitted violated the prompt notice requirement.

- Owens made the extremely damaging decision – after receiving notice of infringement from the patent owner CCS – to put the allegedly infringing technology into juice and ketchup containers, which Owens has admitted did not need such technology, had been sold in huge quantities for many years without it, and which ended up causing REDACTED REDACTED (all of which Owens now seeks to charge to BTR).

- Instead of dealing with CCS, Owens entered into an ill-advised settlement agreement with the wrong party, Chevron – which the court in the CCS Matter found no reasonable person would have done – and did so without notifying or seeking consent from BTR.

- In connection with the Chevron settlement, Owens admitted infringement and validity of the '515 patent by entering into a license and marking its products with the '515 patent number, thereby voluntarily forfeiting its defenses to the claim by CCS and making the CCS Matter essentially impossible to defend.

- In the meantime, Owens received and rejected multiple settlement overtures from CCS, refused to make any settlement offers of its own, engaged in protracted and extremely costly litigation, participated in an unsuccessful mediation, and completely excluded

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

BTR from the entire process.

All of those actions were taken without the knowledge or consent of BTR and without giving BTR any opportunity to participate or protect itself in any way. They demonstrate a complete disregard for the carefully negotiated contractual protections agreed to in the SDA, and constituted material prejudice, a violation of the "no settlement" provision, and a failure to mitigate losses as a matter of law. Indeed, rather than mitigating losses, Owens' actions caused and dramatically exacerbated them. By the time Owens finally gave notice, the die was cast and the outcome a virtual *fait accompli* – no party could be expected to pick up the pieces at that point. Owens repeatedly violated the terms of the SDA and has no right to indemnification as a result.

The indemnity has another important limitation that Owens seeks to skirt. As is common in the context of a sale of a business in which the seller turns over control to a new owner, the indemnity draws a line in the sand at the closing date, and establishes a strict "our watch, your watch" allocation of risk and responsibility. Only losses that arise from the conduct of the business "as currently conducted" at the time of the closing are BTR's responsibility. But any changes to the conduct of the business, decisions made by Owens as the new owner, are expressly outside any BTR indemnification and are Owens' responsibility alone. This makes perfect sense. Owens received all the benefits of the conduct of the business after closing, and BTR had no control or ability to protect itself, particularly where, as here, Owens did not even notify BTR of the claim.

It is undisputed that CPET never sold a single infringing product while it was owned by BTR, was actively seeking a license in order to do so, and advised Owens that a license under the '515 patent was needed more than other patents. But Owens made its own fateful decision to do

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

things differently, to engage in a far more risky strategy of selling the allegedly infringing

products without a license in order to increase its profits and hasten sales.  None of the

infringement alleged by CCS, not a single dollar of damages claimed by CCS, and thus not a

single dollar of alleged losses Owens seeks to recover from BTR, arise from activities engaged in

by CPET prior to closing – all of the alleged infringement and damages relate exclusively to the

unlicensed sales instituted by Owens after closing.  That is confirmed by CCS's court

submissions and damages expert, all of which state expressly that CCS's claim related solely to

Owens' sales of products beginning in late 1998 and early 1999, and by the admissions of

Owens' own witnesses under oath in this case that there was no claim by CCS relating to any

pre-closing conduct.  In short, this case stems from Owens' "watch," not BTR's watch, and is

therefore outside the scope of the SDA's indemnification provisions.

There are two other independent bases for BTR's motion.  The first stems from the

undisputed fact that after the SDA was signed, but before the closing, CPET expressly advised

Owens of the risk of infringement under the '515 patent and the importance of obtaining a

license under that patent.  Under established Second Circuit law, Owens' decision to proceed to

closing armed with that specific knowledge waived any claim of breach of warranty.

The final basis for BTR's motion is that New York public policy prohibits

indemnification for willful misconduct, including willful infringement of a patent.  Owens has

acknowledged that all of the $25.1 million settlement, except for a royalty amount of $5.8

million, was in respect of CCS's claim for willful infringement, for which indemnification is

prohibited.

In sum, all of the facts upon which BTR's motion is based are straightforward and

undisputed, either where Owens has expressly conceded the facts or where there is no basis in

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

the record for disputing them.  If the Court finds that any one of the grounds is meritorious, the

case is over.  Here all of the grounds are meritorious, as Owens' multiple violations preclude any

right to indemnification.

## BACKGROUND

**A.**   **The SDA**

Pursuant to the SDA, on April 30, 1998 (the "Closing"), Owens purchased BTR's

worldwide glass container and plastic packaging and closures business for $3.6 billion.  Of this

amount, $1.6 billion was the price for CPET.  (Joint Pre-Trial Order, Agreed Finding of Fact No.

2, Ex. A to the Declaration of Lawrence J. Conlan dated December 14, 2009 ("Conlan Decl.")

filed concurrently herewith).

The SDA contains an intellectual property warranty in Section 3.14, which reflects the

"our watch, your watch" allocation of risks and responsibilities:

> [w]ith respect to Intellectual Property, the Packaging Companies own, or possess
> licenses or other valid rights to use, all Intellectual Property *necessary to operate*
> *the Packaging Business as currently conducted.*  Except as disclosed in Schedule
> 3.14(a), (i) the conduct of the business of the Packaging Companies *as currently*
> *conducted* does not infringe or otherwise violate any Intellectual Property of any
> third party except where such infringement would not have a Material Adverse
> Effect . . . .  (SDA § 3.14 (emphasis added), Conlan Decl. Ex. B).

The "Packaging Business" referred to in that section is defined in Section 1.1, and reinforces the

"our watch, your watch" agreement:  "[BTR's] worldwide business (including any indirect

equity investment or interest therein) of manufacturing and marketing glass containers and

plastic packaging and closures and the extraction, transportation, manufacture, sale and purchase

of related materials and services, and related licensing and research activities *as conducted from*

*time to time on or prior to the date hereof . . . .*"  (SDA § 1.1 (emphasis added), Conlan Decl. Ex.

B).

The indemnification provision is contained in Section 7.3(a).  In that provision, BTR

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

agreed that "it shall, or shall cause the Selling Companies to, indemnify, defend and hold

harmless Purchaser . . . from, against and in respect of any actual Losses imposed on, sustained,

incurred or suffered by any of the Purchaser Indemnified Parties relating to or arising out of (i)

any breach of any representation or warranty made by Seller contained in this Agreement . . . ."

(SDA § 7.3(a), Conlan Decl. Ex. B).

The indemnity is limited to Losses exceeding a basket of $35 million.  (SDA § 7.3(b),

Conlan Decl. Ex. B).  It is also expressly subject to the mitigation obligation in Section 7.3(c),

which provides that "[n]otwithstanding anything to the contrary in this Agreement, an

Indemnifying Party shall not be liable for any Losses: (i) where the Losses suffered by any

Purchaser Indemnified Party or Seller Indemnified Party, as the case may be, *are the result of or*

*in consequence of any failure by such Indemnified Party to take reasonable and prudent action*

*to mitigate any Losses . . . ."*  (SDA § 7.3(c) (emphasis added), Conlan Decl. Ex. B).

Section 7.4 of the SDA sets forth the requirements for obtaining indemnification for third

party claims.  That section contains the prompt notice requirement that Owens violated:

> [i]n the event that any written claim or demand for which an Indemnifying Party
> may be liable to any Indemnified Party under this Article VII (a "Claim") is
> asserted against or sought to be collected from any Indemnified Party by a third
> party, *such Indemnified Party shall as promptly as practicable notify the*
> *Indemnifying Party in writing of such Claim and the amount or the estimated*
> *amount thereof to the extent then feasible* (which estimate shall not be conclusive
> of the final amount of such Claim)(the "Claim Notice") and the following
> provisions shall be applicable.  The failure on the part of the Indemnified Party to
> give any such Claim Notice in a reasonably prompt manner shall not relieve the
> Indemnifying Party of any indemnification obligation hereunder except to the
> extent that the Indemnifying Party is materially prejudiced thereby.  (SDA § 7.4
> (emphasis added), Conlan Decl. Ex. B).

Section 7.4 also contains the prohibition, which Owens also violated, on entering into any

settlement agreement, making admissions, or otherwise prejudicing a claim until after notice has

been given and the indemnifying party has elected not to exercise its option to assume the

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

defense:

> [The party seeking indemnification] *shall not settle, admit or in any other way*
> *materially prejudice a Claim* for which it is indemnified by the Indemnifying
> Party *without the written consent of the Indemnifying Party* unless the
> Indemnifying Party elects not to defend the Indemnified Party against such Claim
> or if the Indemnifying Party shall not notify the Indemnified Party of its desire to
> defend the Indemnified Party with respect to such Claim during the Notice Period
> or if the Indemnifying Party shall fail to defend such Claim in good faith and on a
> timely basis following the Indemnifying Party's election to defend such claim.
> (SDA § 7.4 (emphasis added), Conlan Decl. Ex. B).

**B.**     **Pre-Closing Conduct of the CPET Business; Owens' Due Diligence and BTR's**
**Disclosures to Owens**

Prior to Closing, CPET was researching and developing oxygen barrier technologies

intended primarily for use in plastic beer bottles, and CPTX-312 was one option under

consideration. (Deposition of Gerard Kerins, Sept. 18, 2003 ("Kerins Tr.") 145:10-146:16,

Conlan Decl. Ex. C). In the course of developing CPTX-312, CPET had recognized that there

was a risk of infringement of certain patents that had been obtained by a predecessor of CCS

named Carnaud Metal Box, including the '515 patent. (Ex. 65 at OI001515-522, Conlan Decl.

Ex. D). Thus, Richard Croiter, CPET's general counsel, testified in this action that his view at

the time was that it would be a good strategy for CPET to get a license before selling containers

containing CPTX-312 because CPET knew about the CCS patents: "given the vagaries of

whatever might happen, including litigation, if we could get a license and we could do that at a

reasonable cost, we thought that was a good strategy to pursue." (Deposition of Richard Croiter,

Mar. 23, 2009 ("Croiter Tr.") 29:17-21, Conlan Decl. Ex. I). Croiter's boss, Gerard Kerins, who

was CPET's president under BTR, confirmed BTR's strategy to obtain a license under the '515

patent: *"if there was any risk at all, that we would be in a patent litigation down the road with*

*some – with someone who might be a competitor of ours. We would rather short-circuit that and*

*manage it commercially . . . ."* (Kerins Tr. 66:5-16, Conlan Decl. Ex. C) (emphasis added).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

CCS's predecessor was a party to a cross-license agreement with another company called

PLM AB ("PLM"), pursuant to which REDACTED

REDACTED (Ex. 88 at CPT065146, Conlan Decl. Ex. E). As a result, prior to Closing – and

prior to making any sales of CPTX-312 products – CPET had commenced negotiations for such

a sublicense with PLM. (Deposition of Russell C. Berkoben, Mar. 4, 2008 ("Berkoben Tr.")

19:1-20, 35:3-22, 38:14-22, Conlan Decl. Ex. F; Kerins Tr. 67:18-68:17, 91:2-15, Conlan Decl.

Ex. C; Deposition of Bhupendra Khetani, July 17, 2009 ("Khetani Tr.") 487:24-488:10, Conlan

Decl. Ex. G; FED. R. CIV. P. 30(b)(6) Deposition of Owens ("Owens 30(b)(6) Tr."), Apr. 16,

2009, 76:14-77:8, Conlan Decl. Ex. H).

It is undisputed that CPET never sold any CPTX-312 containers prior to Closing.

(Kerins Tr. 135:3-11, Conlan Decl. Ex. C; Ex. 9 at 3-5, Conlan Decl. Ex. J; Ex. 10 at 2-3, Conlan

Decl. Ex. K; Owens 30(b)(6) Tr., Apr. 16, 2009, 54:15-19, Conlan Decl. Ex. H). In fact, CPET

under BTR's ownership had projected zero sales of containers containing CPTX-312 for all of

1998, including the balance of the year following the April sale to Owens. (Ex. 139 at

OI0000350, 353, Conlan Decl. Ex. L; Khetani Tr. 429:18-430:12, 433:6-435:3, 447:1-14, Conlan

Decl. Ex. G). During Owens' due diligence of CPET, BTR and CPET disclosed these

projections, which embodied the determination not to rush into any sales of CPTX-312 products.

It is undisputed that Owens' board of directors received that information and was aware of it at

the time it approved the transaction. (Khetani Tr. 429:18-430:12, 433:6-435:3, 447:1-448:15,

Conlan Decl. Ex. G; Ex. 139, Conlan Decl. Ex. L).

CPET also fully disclosed the composition of CPTX-312 to Owens, as well as the risk

that CPTX-312 infringed the '515 patent. (Ex. 65 at OI001515-522, Conlan Decl. Ex. D;

Khetani Tr. 358:20-359:20, 487:24-488:10, 488:20-490:24, 516:10-517:10, Conlan Decl. Ex. G).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Specifically, on or around March 13, 1998, CPET provided Owens with documents that, among

other things, described the relevant patents, including the '515 patent, as well as the ongoing

negotiations with PLM for a sublicense.  A memorandum by Mr. Croiter that was included in the

package emphasized that the CCS patents, including the '515 patent, were REDACTED

REDACTED and that because of the risk of infringement, CPET "would need from PLM a sub-license

REDACTED

REDACTED       (Ex. 65 at OI0001516, Conlan Decl. Ex. D).  Owens has conceded that all

this information was disclosed by CPET and received by Owens' senior executives, including the

general counsel of Owens and its senior business leadership.  (Khetani Tr. 487:24-488:10,

488:20-490:24, Conlan Decl. Ex. G; Owens 30(b)(6) Tr., Apr. 16, 2009, 81:6-18, Conlan Decl.

Ex. H; Berkoben Tr. 18:20-19:20, Conlan Decl. Ex. F; Ex. 65 at OI0001495, Conlan Decl. Ex.

D).

     Owens has at times attempted to assert that it blindly followed BTR's strategy after

Closing, but it subsequently has had to concede that, as would be expected of a global enterprise

engaged in a multi-billion dollar acquisition, it conducted its own full analysis of the '515 patent

prior to Closing and did not rely on BTR in making its decisions.[1]  After Closing, Owens

assumed direct control over CPET, appointing one of its own employees, Russell Berkoben, to

replace CPET's president, Gerard Kerins (Berkoben Tr. 10:8-20, Conlan Decl. Ex. F), and

---

[1] "Q: Did you or anyone at Owens undertake your own review of the 515 patent, its file history or any of
the other issues that you had discussed in that conversation prior to the closing? . . . A: Yes." (Owens
30(b)(6) Tr., Apr. 16, 2009, 81:19-82:3, Conlan Decl. Ex. H; *see also* 119:18-120:2 "Q: Did you rely on
Ms. Hendricks's oral opinion or any oral opinion by Ms. Hendricks that the patent was not infringed or
invalid by the CPTX-312 technology at the time you acquired the company, yes or no? . . . A: No.";
Khetani Tr. 366:17-367:23, Conlan Decl. Ex. G).  Owens has refused to allow discovery with respect to
its litigation strategy and its analysis of the '515 patent, claiming privilege.  (Khetani Tr. 351:4-352:16,
366:17-367:23, 386:12-388:8, 499:23-501:19, 511:8-513:6, Conlan Decl. Ex. G; Owens 30(b)(6) Tr.,
Apr. 16, 2009, 81:19-83:1, Conlan Decl. Ex. H; Deposition of James Baehren, Apr. 24, 2008 ("Baehren
Tr.") 9:16-10:23, 11:1-17, Conlan Decl. Ex. M).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Owens has acknowledged that from that point forward it was in full control of CPET's strategy and direction. (Khetani Tr. 535:5-13, 537:4-10, Conlan Decl. Ex. G). More fundamentally, any assertion by Owens that it blindly followed a BTR strategy is irrelevant under the SDA, which does not relieve Owens from its contractual obligations simply because it (implausibly) claims that it failed to make independent decisions.

**C.    Post-Closing Conduct of the Business by Owens:  Prejudice, Failure to Mitigate, and Late Notice**

 *1.    "OI Initiatives:" Owens starts selling infringing products without a license*

 Based on projections provided by BTR, Owens had concluded that the purchase of CPET would be dilutive to Owens' earnings per share. (Khetani Tr. 459:8-23, Conlan Decl. Ex. G; Ex. 139, Conlan Decl. Ex. L). As a result, without informing BTR, Owens conceived of strategies referred to as "OI Initiatives" which were new "high growth" actions that Owens would take to run CPET differently from how it had been run when owned by BTR. The purpose of these "OI Initiatives" was to "stretch" the business to generate additional sales and revenues, in order to offset the dilutive impact of the purchase. (Khetani Tr. 441:15-442:3, Conlan Decl. Ex. G: "we would run differently than they were . . . we really had to stretch our effort to generate a lot of sales and a lot of revenues, maintain profit margins . . . our guys would have to work hard to not only do what they have said, but do this additional things."; Ex. 139, Conlan Decl. Ex. L).

 One of the key OI Initiatives was to begin selling CPTX-312 containers earlier than BTR had planned. (Khetani Tr. 440:18-442:8, 449:4-452:16 ("what are additional things you could do with this technology, how could you put it in really high gear and make some more money out of it."), Conlan Decl. Ex. G; Ex. 139, Conlan Decl. Ex. L; Ex. 9 at 3-5, Conlan Decl. Ex. J). Owens was well aware that there was a potential infringement issue with CPTX-312, because BTR had told it so. (Khetani Tr. 477:5-7, Conlan Decl. Ex. G: "Q: And so you know there's a potential

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

infringement issue? A: Yes"; *see also* Khetani Tr. 488:3-6, Conlan Decl. Ex. G: "*They told me that they are trying to get a license for it. Why would they bother unless they felt there might be an issue with it?*"). In fact, Owens knew that selling CPTX-312 containers could lead to a patent infringement lawsuit by CCS. (Owens 30(b)(6) Tr., Apr. 16, 2009, 110:2-19, Conlan Decl. Ex. H).[2]

Beginning in the fourth quarter of 1998, Owens/CPET began selling plastic beer containers containing CPTX-312 without a license. (Ex. 9 at 3-4, Conlan Decl. Ex. J; Owens 30(b)(6) Tr., Apr. 16, 2009, 90:17-91:1, Conlan Decl. Ex. H). Soon thereafter – even though it had been advised of CCS's infringement claim by this time – Owens made the highly prejudicial decision to begin putting CPTX-312 into additional products that it has admitted had no need for it. Specifically, Owens/CPET began using CPTX-312 in its already successful line of plastic juice containers in the first quarter of 1999. In the next quarter, it did the same thing with plastic ketchup containers. (Ex. 9 at 3-5, Conlan Decl. Ex. J; Owens 30(b)(6) Tr., June 18, 2009, 95:23-96:17, Conlan Decl. Ex. P). **REDACTED**
**REDACTED** (Expert Report of Paul K. Meyer, Apr. 14, 2004 ("Meyer Report") 50, attach. E.1, Conlan Decl. Ex. Q).

Owens has admitted that it was not necessary to use CPTX-312 for juice and ketchup containers. (Berkoben Tr. 26:22-27:4, Conlan Decl. Ex. F; Meyer Report 19, Conlan Decl. Ex. Q; Croiter Tr. 130:16-131:3, Conlan Decl. Ex. I; Deposition of Dr. Christopher A. Vellturo, Oct.

---

[2] On December 21, 1998, after the initial sale of containers containing CPTX-312, Owens obtained an opinion of non-infringement and invalidity from Therese Hendricks, a patent attorney from Wolf, Greenfield & Sacks based in Boston, MA. (Ex. 7, Conlan Decl. Ex. N; Croiter Tr. 121:8-23, Conlan Decl. Ex. I; Owens 30(b)(6) Tr., Apr. 16, 2009, 108:4-110:19, Conlan Decl. Ex. H). Owens solicited the opinion because the CPTX-312 "product was being rolled out and the opinion followed"; "the business understanding is then the product would be known in the marketplace to others and that would be a good time to have this. . . . A bottle that's in the public domain is more likely to be seen than one that was under test market research." (Owens 30(b)(6) Tr., Apr. 16, 2009, 109:12-110:19, Conlan Decl. Ex. H).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

20, 2009 ("Vellturo Tr.") 209:23-211:3, Conlan Decl. Ex. S). It is undisputed that all such sales

could have been supplied using an acceptable alternative oxygen barrier such as EVOH (ethylene

vinyl alcohol). (Meyer Report 19, Conlan Decl. Ex. Q; Expert Report of Gordon J. Bockner,

Apr. 3, 2004, 9, Conlan Decl. Ex. R). Indeed, CPET had already sold REDACTED

REDACTED (Meyer Report 19, Conlan Decl. Ex.

Q). Owens' decision to introduce CPTX-312 into juice and ketchup bottles was inexcusable and

in complete disregard of its contractual obligations under the SDA, given that it knew of CCS's

infringement claim and that there were other non-infringing materials that were established and

proven alternative oxygen barriers for those products.

Owens conducted itself as if it recognized that the introduction of CPTX-312 was its own

decision and not a continuation of the business of CPET prior to Closing for which it was

entitled to indemnification. Thus, for example, on October 6, 1999, Owens sent a letter advising

BTR of a different claim brought by a company called North American Container (the "NAC

Matter"). (Ex. 35, Conlan Decl. Ex. AA). However, Owens made no reference to or disclosure

of the CCS Matter in that letter, even though it knew of CCS's claim no later than February 1999

and CCS had actually filed suit in April 1999. (Ex. 35, Conlan Decl. Ex. AA; Owens 30(b)(6)

Tr., June 18, 2009, 82:15-83:24, 99:8-16, Conlan Decl. Ex. P; Ex. 12, Conlan Decl. Ex. W).

   2.    *Owens receives and rejects settlement offers from CCS*

CCS learned of the CPTX-312 containers almost immediately after Owens/CPET began

selling them in late 1998. CCS tested some samples and notified Owens of its infringement

claim. (CPT100697-712 at 701-702, Conlan Decl. Ex. O; Ex. 99, Conlan Decl. Ex. T; Owens

30(b)(6) Tr., June 18, 2009, 82:15-83:11, Conlan Decl. Ex. P; Berkoben Tr. 70:18-72:16, Conlan

Decl. Ex. F). In February 1999, representatives of Owens/CPET and CCS met to discuss CCS's

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

claim. (Ex. 99, Conlan Decl. Ex. T; Owens 30(b)(6) Tr., June 18, 2009, 82:15-83:18, Conlan Decl. Ex. P; Berkoben Tr. 70:18-72:16, Conlan Decl. Ex. F). At that time, CCS offered to provide a license under the '515 patent in exchange for a cross-license to Owens/CPET's multi-layer bottling technology. (Trial Testimony of Frank Mechura, July 24, 2001 ("Mechura Tr.") 1144:7-1145:4, Conlan Decl. Ex. U; Berkoben Tr. 70:18-73:20, Conlan Decl. Ex. F; Deposition of Michael Hoffman, Sept. 10, 2003, 88:11-89:7, Conlan Decl. Ex. V). Owens rejected that offer and refused to make any offer of its own to acquire a license from CCS under the '515 patent on any terms. (Owens 30(b)(6) Tr., June 18, 2009, 92:18-94:12, Conlan Decl. Ex. P). In fact, CCS regularly and consistently offered to discuss a license with CPET, but Owens ignored those overtures (Mechura Tr. 1157:13-1159:1, Conlan Decl. Ex. U) and chose instead to litigate for more than five years and spend approximately $14 million in legal fees and other expenses that it now seeks to charge to BTR. Owens did not advise BTR of any of this.

After CCS commenced the lawsuit, Owens/CPET agreed to engage in limited discovery and engage in a mediation of the dispute. (Ex. 108, Conlan Decl. Ex. Z; Owens 30(b)(6) Tr., June 18, 2009, 150:2-151:17, Conlan Decl. Ex. P). On February 29, 2000, the parties participated in an early neutral evaluation ("ENE"), at which time both parties made presentations to a designated neutral individual who provided an assessment of the claims and defenses. (Joint Pre-Trial Order, Agreed Finding of Fact No. 10, Conlan Decl. Ex. A; Berkoben Tr. 128:11-128:20, Conlan Decl. Ex. F). None of Owens' witnesses purported to remember the results of the ENE, but they agree that Owens never made any proposal for settlement at that time. (Owens 30(b)(6) Tr., June 18, 2009, 158:13-19, 170:11-172:9, Conlan Decl. Ex. P; Berkoben Tr. 128:11-20, Conlan Decl. Ex. F, Croiter Tr. 170:4-24, Conlan Decl. Ex. I). Again, BTR was excluded from this entire process. (Joint Pre-Trial Order, Agreed Finding of Fact No.

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

10, Conlan Decl. Ex. A).

> 3.   *All infringement and damages claimed in the CCS Matter were for Owens/CPET's sales of CPTX-312 containers without a license*

In its lawsuit, CCS claimed that Owens/CPET's infringement began in late 1998, and did not claim that any infringement had occurred while BTR owned CPET.  CCS made this clear in a submission to the court:  "*[Owens/CPET] has been infringing the patent in suit since late 1998. [CCS] filed this action in April 1999 seeking redress for that infringement.*"  (Ex. 44 at 1, Conlan Decl. Ex. X) (emphasis added).  Under the Patent Act, CCS was only entitled to damages of a reasonable royalty on CPET's sales (35 U.S.C.§ 284), and all such sales occurred after Closing – CCS did not and could not claim damages based on any activities of CPET prior to Closing. (Expert Report of Creighton G. Hoffman, Jan. 15, 2004 ("Hoffman Report") 2-5, 15, Conlan Decl. Ex. Y; Baehren Tr. 124:20-125:9, Conlan Decl. Ex. M; Vellturo Tr. 65:22-66:10, Conlan Decl. Ex. S; Ex. 44 at 1, Conlan Decl. Ex. X).  As a result, both parties' experts in the CCS Matter measured damages exclusively based on Owens/CPET's sales of CPTX-312 containers beginning in January 1999.  (Hoffman Report 3-4, ex. D, Conlan Decl. Ex. Y; Meyer Report 73, attach. O, Conlan Decl. Ex. Q).

After Closing, Owens engaged in license negotiations with PLM (Owens 30(b)(6) Tr., Apr. 16, 2009, 96:15-97:15, Conlan Decl. Ex. H), but did not wait until those negotiations were concluded before it began to sell products containing CPTX-312.  Under the terms of PLM's cross-license with CCS's predecessor, PLM's ability to grant a sublicense changed when CCS filed suit on April 8, 1999.  (Ex. 12, Conlan Decl. Ex. W).  Specifically, the cross-license provided that REDACTED

REDACTED

REDACTED

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*



REDACTED                                        (Ex. 88 at CPT065149, Conlan
Decl. Ex. E).

Inexplicably, Owens continued to seek a license from PLM for another year after CCS filed its

complaint, until March 2000, when PLM confirmed that it could no longer grant a sublicense

under the '515 patent without CCS's consent. (Berkoben Tr. 47:18-49:11, 95:7-17, Conlan Decl.

Ex. F).

    4.    *Owens enters into settlement agreement with the wrong party, Chevron, and*
        *voluntarily takes actions that forfeit defenses to CCS's claim*

In March 2000, after Owens finally accepted that PLM could no longer offer a unilateral

sublicense, Owens still refused to approach CCS. Instead, it approached a different entity,

Chevron, with whom Owens had a longstanding and close commercial relationship. (Berkoben

Tr. 49:12-21, 95:7-17, 134:1-135:4, Conlan Decl. Ex. F; Owens 30(b)(6) Tr., June 18, 2009,

172:10-173:3, Conlan Decl. Ex. P; Joint Pre-Trial Order, Owens' Proposed Finding of Ultimate

Fact No. 29, Conlan Decl. Ex. A). Owens has admitted that BTR never mentioned Chevron

prior to Closing, and certainly never suggested that Chevron had any rights covering CPTX-312.

(Khetani Tr. 520:21-521:4, Conlan Decl. Ex. G).[3]

This was another ill-fated and highly prejudicial decision, which Owens made totally on

its own. (Owens 30(b)(6) Tr., June 18, 2009, 181:4-182:6, 186:24-187:8, Conlan Decl. Ex. P).

CCS's predecessor had entered into a license agreement with Chevron in 1993 that granted only

---

[3] Although Owens has admitted that its attorneys conducted an extensive analysis of Chevron's rights,
Owens has blocked all discovery concerning this analysis, claiming privilege. (Owens 30(b)(6) June 18,
2009, 173:10-175:20, 180:21-181:3, Conlan Decl. Ex. P; Berkoben Tr. 115:6-14, 119:7-121:15, Conlan
Decl. Ex. F).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

limited rights under the '515 patent and did not include any rights with respect to CPTX-312. (CPT043840-869, Conlan Decl. Ex. BB).  When Owens asked Chevron to warrant that it owned the right to sublicense CPTX-312, Chevron refused.  (Owens 30(b)(6) Tr., Apr. 16, 2009, 219:7-220:8, Conlan Decl. Ex. H; Ex. 21, Art. 7, Conlan Decl. Ex. EE).  But Owens entered into the settlement agreement and sublicense with Chevron anyway.  (CPT101500-549, Conlan Decl. Ex. FF; Ex. 21, Conlan Decl. Ex. EE; Owens 30(b)(6) Tr., Apr. 16, 2009, 219:7-221:4, Conlan Decl. Ex. H).  The court in the CCS Matter subsequently found that no "reasonable person" would have believed that Chevron had rights with respect to CPTX-312.  (*Crown Cork & Seal Tech. Corp. v. Continental PET Tech. Inc.*, 232 F. Supp. 2d 294, 304 (D. Del. 2002), Conlan Decl. Ex. HH).

After entering into the settlement agreement and sublicense with Chevron, Owens/CPET began marking its CPTX-312 containers with the '515 patent number.  (CPT101500-549, Conlan Decl. Ex. FF; Ex. 21, ¶ 4.1, Conlan Decl. Ex. EE).  Once again, this was extremely prejudicial. The marking of the containers pursuant to the Chevron license constituted a public admission by Owens/CPET that the products accused in the CCS Matter were, in fact, covered under valid claims of the '515 patent.  This is exactly what CCS told the court after the determination that Chevron had no rights with respect to CPTX-312: "Chevron and [Owens/CPET] have each paid tribute to the validity of the patent in suit by taking a license under it.  Moreover, [Owens/CPET] has admitted that its products infringe the patent by marking [CCS's] patent number on its product packaging."  (Ex. 44 at 2, Conlan Decl. Ex. X).  Owens did not notify BTR – and certainly never obtained BTR's consent – before entering into the settlement agreement and license with Chevron and admitting the validity and infringement of the '515 patent.  (Owens 30(b)(6) Tr., June 18, 2009, 186:24-187:8, Conlan Decl. Ex. P; Ex. 44 at 2, Conlan Decl. Ex. X).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Finally, on March 6, 2001, more than two years after learning of the CCS Matter, Owens sent a letter to BTR that for the first time advised BTR that Owens was going to seek indemnification with respect to the CCS Matter. (Ex. 36, Conlan Decl. Ex. GG; Owens 30(b)(6) Tr., June 18, 2009, 83:19-84:14, 99:8-16, Conlan Decl. Ex. P; Joint Pre-Trial Order, Agreed Finding of Fact No. 8, Conlan Decl. Ex. A).

> 5.   *The court in the CCS Matter rules that Chevron has no rights that cover CPTX-312*

In November 2002, the court in the CCS Matter determined that Chevron had no right to license CPTX-312. *Crown Cork & Seal Tech. Corp.*, 232 F. Supp. 2d at 304-306, Conlan Decl. Ex. HH. At that point, after three and a half years of litigation, Owens discharged its lead team of attorneys and brought in a new team that asserted new legal defenses. (Owens 30(b)(6) Tr., June 18, 2009, 220:16-221:22, Conlan Decl. Ex. P). However, Owens still made no effort to settle with CCS, and continued to pay royalties to Chevron through at least January 2004. (Owens 30(b)(6) Tr., Apr. 16, 2009, 218:11-219:6, 225:2-17, Conlan Decl. Ex. H; CPT056813, Conlan Decl. Ex. II; CPT043889, Conlan Decl. Ex. JJ; OI0051168, Conlan Decl. Ex. KK). Owens ultimately paid Chevron more than $5 million in royalties, approximately $2.9 million of which it now seeks from BTR. (Owens 30(b)(6) Tr., June 18, 2009, 194:4-16, Conlan Decl. Ex. P). Following the court's decision, Owens/CPET also continued to sell REDACTED allegedly infringing bottles, the overwhelming majority of which were for juice and ketchup bottles which did not require CPTX-312. (Meyer Report, attach. E.1, Conlan Decl. Ex. Q).

> 6.   *Owens settles the CCS Matter and pays a "litigation premium" in respect of CCS's claim of willful infringement*

On May 28, 2004, Owens advised BTR that it had agreed to settle the CCS Matter for a lump sum payment of $25 million for past infringement, and an ongoing royalty on sales of

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

CPTX-312 containers of **REDACTED** for beer and **REDACTED** for

juice and ketchup.  (Owens 30(b)(6) Tr., Apr. 16, 2009, 229:10-18, Conlan Decl. Ex. H; Ex. 92

at 1, Conlan Decl. Ex. LL).  The lump sum payment was subsequently increased by $100,000 to

compensate for a delay in finalizing the agreements.  (CPT000311-331, Conlan Decl. Ex. MM;

CPT000177-178, Conlan Decl. Ex. NN).

     Applying the agreed royalty rates to past sales of infringing products (and adding the

agreed $100,000) would have only yielded damages of approximately $5.8 million, not the $25.1

million Owens agreed to pay.  (*See* Meyer Report, attach. E.1 for sales through June 2003,

Conlan Decl. Ex. Q; subsequent sales extrapolated based on historical sales figures).  When

asked to explain that discrepancy, Owens admitted that the difference between the agreed royalty

and the $25.1 million payment was based on CCS's claim that Owens/CPET engaged in willful

misconduct:

> Q: The question is how you came to this $25 million figure if the royalty going
> forward was reasonable at **REDACTED** for non-food – for food and juice and
> **REDACTED** for beer?
> * * *
> A:  The 25 million obviously includes a litigation premium or the settlement
> value.
> Q: What litigation premium?  For what?
> A. For –
> Q: Wasn't the basis of their damages claim a reasonable royalty?  Wasn't that the
> only basis for their damages claim?
> A:  That was their basis, yes.
> Q: Why would they be entitled to anything in settlement over and above a
> reasonable royalty?
> A: *Because their case as they explained they were going to bring it where they
> were going to seek treble damages and fees for willfulness which gets it over 200
> million.*

(Owens 30(b)(6) Tr., Apr. 16, 2009, 234:11-235:11, Conlan Decl. Ex. H) (emphasis added).

     On March 15, 2005, approximately seven years after Closing, Owens sued BTR seeking

indemnification.  (Joint Pre-Trial Order, Agreed Finding of Fact No. 12, Conlan Decl. Ex. A).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

## ARGUMENT

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact exists only if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 405 (S.D.N.Y. 2006).

The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party, who must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citing *Celotex*, 477 U.S. at 324). The non-moving party cannot create a genuine issue of material fact by providing evidence that is "merely colorable, conclusory, speculative or not significantly probative." *Parker v. Chrysler Corp.*, 929 F. Supp. 162, 165 (S.D.N.Y. 1996).

Judgment as a matter of law is appropriate where, as here, the relevant contract language is unambiguous. *Adirondack Transit Lines, Inc., v. United Transp. Union, Local 1582*, 305 F.3d 82, 85, 89 (2d Cir. 2002). If the court finds that the contract terms are not ambiguous it should interpret the contract without the aid of extrinsic evidence, and it may then award summary judgment. *Creative Waste Mgmt., Inc. v. Capitol Envtl. Services, Inc.*, 458 F. Supp. 2d 178, 186 (S.D.N.Y. 2006). Here, Owens offers only unsubstantiated, speculative and irrelevant theories in response to the hard facts that defeat its claims. Summary judgment dismissing its claims is warranted.

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

**A.**     **Owens' failure to provide notice of the CCS Matter as promptly as practicable caused material prejudice to BTR**

Owens made no attempt to notify BTR of the CCS Matter until March 2001, more than two years late. Owens has finally admitted that this violated the SDA. (Joint Pre-Trial Order, Agreed Finding of Fact No. 8, Conlan Decl. Ex. A; SDA § 7.4, Conlan Decl. Ex. B). This admission lays the groundwork for a determination that Owens' conduct in the CCS Matter caused material prejudice to BTR as a matter of law.

Under the SDA, late notice does not relieve the parties of their indemnification obligations "except to the extent that the Indemnifying Party is materially prejudiced thereby." (SDA §7.4, Conlan Decl. Ex. B). In this motion, BTR is not relying on a mere "presumption" of prejudice. Here, Owens engaged in highly risky and damaging conduct, including selling over a billion allegedly infringing bottles that had no need for the infringing technology, entering into a settlement agreement with the wrong party, voluntarily forfeiting its defenses in the process, and rejecting CCS's overtures to settle the case, all without ever attempting to notify BTR. This is material prejudice – actual prejudice, not presumed – as a matter of law. *See, e.g., Wainco Funding v. First American Title Ins. Co. of N.Y.*, 219 A.D.2d 598, 599, 631 N.Y.S.2d 81, 82 (2d Dep't 1995) (affirming grant of summary judgment, finding that "[b]y depriving the defendant the opportunity to participate [in the proceedings] in any way, the plaintiff's failure to give notice *actually prejudiced* the defendant") (emphasis added).

In *American Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 440 (2d Cir. 1995), the Second Circuit analyzed two groups of insurance policies in connection with environmental liabilities. The first group did not require a showing of prejudice. However, the second group of policies (the "1977 and 1978 policies") expressly required the indemnifying party to show actual prejudice. *Id.* The court considered the 1977 and 1978 policies separately, and found that actual

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

prejudice arises where there have been significant developments in a case from which an

indemnifying party has been blocked from participating.  *Id.*  The Second Circuit found that the

indemnifying party was actually prejudiced because it was "excluded from the negotiating

process.  In addition, the passage of time renders it difficult to reconstruct relevant events -

equipment ages, records vanish, and memories fade."  *Id.*  The insurer there had not been given

notice for several years, which "deprived it of the opportunity to participate with an eye to

reducing the ultimate costs of remediation.  At the end of years of negotiations about which it

had no notice, [the insurer] was presented with a virtual *fait accompli.*"  *Id.*

In discussing the 1977 and 1978 policies, the court expressly rejected the argument

Owens makes here with respect to showing actual prejudice, holding that an indemnifying party

*"cannot be expected to show precisely what the outcome would have been had timely notice been*

*given.  This uncertainty, however, is the result of the failure of the insured to comply with the*

*policy, and it should not be permitted to use that uncertainty as a weapon against the insurer.*"

*Id.* at 440-441 (emphasis added).[4]

By the time it finally gave notice to BTR, Owens had taken actions that were so highly

prejudicial that the CCS Matter had become a "virtual *fait accompli.*"  Under *American*

*Insurance*, Owens' complete exclusion of BTR from the process for two years – the "very

---

[4] This refutes Owens' argument that BTR somehow has to prove "what it would have done differently."
The cases Owens relies on are inapposite.  They relate to reinsurers, and reinsurers do not have the same
rights as primary insurers to participate in the settlement and defense of a claim.  Owens' cases expressly
distinguish the cases involving primary insurers on that basis. *See, e.g., Unigard Sec. Ins. Co. v. North
River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1993); *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576,
584 N.Y.S.2d 290 (1992).  In the same vein, Owens has suggested that because BTR did not assume the
defense of the NAC Matter, it would not have assumed the defense of the CCS Matter even if Owens had
given prompt notice.  This argument is logically flawed, because the NAC Matter stemmed from wholly
different facts and involved a meritless claim that was dismissed on summary judgment and, in any event,
is contractually irrelevant – nothing would relieve Owens of its obligations to provide prompt notice of
the CCS Matter, to avoid prejudicial conduct, not to settle or admit any claims, and to mitigate damages,
all of which Owens violated.

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

deprivation of the opportunity to play a meaningful role" in Owens' determinations to reject

CCS's settlement offers, to refuse to make any offers of its own, and to engage in costly and

protracted litigation – is enough to establish actual prejudice as a matter of law. *American Ins.*,

56 F.3d at 440. But Owens' prejudicial conduct goes well beyond that:

• Owens made the extremely damaging decision – having already been put on notice of

infringement by CCS – to put the CPTX-312 technology into juice and ketchup

containers, which Owens has admitted did not need such technology, had been sold in

huge quantities for many years without it, and which ended up causing REDACTED

REDACTED (all of which Owens now seeks to charge to BTR).

(Berkoben Tr. 26:22-27:4, Conlan Decl. Ex. F; Meyer Report 19, 50, Conlan Decl. Ex. Q;

Croiter Tr. 130:16-131:3, Conlan Decl. Ex. I; Vellturo Tr. 209:23-211:3, Conlan Decl.

Ex. S).

• Owens decided to enter into a settlement agreement and license with Chevron, even

though Chevron had refused to provide a warranty that it owned the technology at issue

and, as the court ultimately found, no "reasonable person" would have believed it did.

(Owens 30(b)(6) Tr., Apr. 16, 2009, 219:7-220:8, Conlan Decl. Ex. P; CPT101500-549,

Conlan Decl. Ex. FF; Ex. 21, Conlan Decl. Ex. EE; *Crown Cork & Seal Tech. Corp.*, 232

F. Supp. 2d at 304, Conlan Decl. Ex. HH). As CCS advised the court in the CCS Matter,

this had the effect of waiving any argument as to the validity of the '515 patent:

"Chevron and [Owens/CPET] *have each paid tribute to the validity of the patent in suit*

*by taking a license under it.*" (Ex. 44 at 2, Conlan Decl. Ex. X) (emphasis added).

• Compounding the problem and exacerbating the prejudice, Owens began marking its

products with the '515 patent number, thereby publicly admitting that its products

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

infringed the '515 patent and voluntarily forfeiting its defenses to CCS's claim.  *Boyd v. Schildkraut Giftware Corp.,* 936 F.2d 76, 79 (2d Cir. 1991), *cert. denied,* 502 U.S. 941 (1991) ("placing a patent number on a product will estop a manufacturer from denying that his product embodies the patent for purposes of liability for both patent infringement damages and patent license royalties"); *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 385 (S.D.N.Y. 2003).  Once again, CCS made the effect of Owens' actions clear, explaining to the court that Owens/CPET had "*admitted that its products infringe the patent by marking [CCS's] patent number on its product packaging.*"  (Ex. 44 at 2, Conlan Decl. Ex. X) (emphasis added).

• In addition to forfeiting key legal defenses, Owens prejudiced BTR by agreeing to pay "damages" to Chevron, as well as a future "royalty" for rights that Chevron did not have, $2.9 million of which Owens now seeks from BTR.  (CPT101500-549 at 500, Conlan Decl. Ex. FF; Ex. 21 at 3, Conlan Decl. Ex. EE).  In addition, following its settlement with Chevron, Owens/CPET continued to sell infringing containers, ignoring CCS's lawsuit and continuing to increase the damages sought, all without giving notice to BTR.  (Meyer Report, attach. E.1, Conlan Decl. Ex. Q; Owens 30(b)(6) Tr., June 18, 2009, 186:24-187:8, Conlan Decl. Ex. P).

Under all of these circumstances, there can be no genuinely disputed issue of material fact that Owens' conduct was materially prejudicial to BTR.  Under the unambiguous terms of the SDA, Owens has no right to indemnification with respect to the CCS Matter.

**B.   <u>Owens breached the SDA by settling with Chevron without notifying BTR</u>**

The Chevron settlement also constituted a violation of a separate provision of the SDA, which provides that Owens "shall not *settle, admit or in any other way material prejudice*" a claim without first notifying and obtaining the consent of the purported indemnitor.  (SDA §7.4,

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Conlan Decl. Ex. B) (emphasis added).  Owens breached all three of these prohibitions when it entered into the settlement agreement with Chevron.  This provides an independent basis for finding that Owens violated the SDA in multiple respects and has no right to claim indemnification from BTR.  *See TLC Beatrice Int'l Holdings, Inc. v. CIGNA Ins. Co.*, No. 97 Civ. 8589 (MBM), 2000 WL 282967,  at *9 (S.D.N.Y. Mar. 16, 2000) (granting the defendant's motion for summary judgment where the plaintiff failed to obtain written consent before settling a derivative action),  *aff'd sub nom. Lewis v. Cigna Ins. Co.*, 234 F.3d 1262 (2d Cir. 2000) (text at 2000 WL 1654530 (Table)); *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177-179, 855 N.Y.S.2d 45, 48-49 (2008) (granting summary judgment and denying recovery of settlement proceeds from the insurers where the insured entered into a settlement agreement without obtaining required consent).  It also provides stark confirmation of the fact that Owens made no attempt to comply with the SDA – indeed, it acted as if the CCS Matter was not covered by the SDA at all.

Besides resulting in at least $2.9 million in "damages" and "royalty" payments that Owens paid to Chevron and now seeks from BTR, and extensive additional liability to CCS for infringing sales that were made purportedly pursuant to a "license" from the wrong party, Owens' settlement with Chevron resulted in the voluntary forfeiture of invalidity and non-infringement defenses to CCS's claim.  Owens' actions made CCS's claim essentially indefensible.

In short, when Owens entered into the Chevron settlement and sublicense, it breached the express prohibitions in Section 7.4 of the SDA and lost any right it might otherwise have had to seek indemnification.

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

**C.      Owens failed to take reasonable and prudent actions to mitigate losses in the CCS Matter**

New York law imposes an obligation to mitigate losses, and here Section 7.3(c) of the SDA reinforces that requirement by eliminating liability for any losses that are "the result of or in consequence of any failure by such Indemnified Party to take reasonable and prudent action to mitigate any Losses . . . ." (SDA § 7.3(c)(i), Conlan Decl. Ex. B). All of the highly prejudicial conduct by Owens described above demonstrates Owens' failure to take reasonable and prudent action to mitigate losses as required by the SDA.

Mitigation can in some cases be a factual issue where there is a question as to the ability of the plaintiff to have avoided the losses. *See, e.g., Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 222-223 (S.D.N.Y. 2003). However, where the evidence of a failure to mitigate is clear, courts determine the issue as a matter of law. *Drummond v. Morgan Stanley & Co., Inc.*, No. 95 Civ. 2011 DC, 1996 WL 631723, at *2-3 (S.D.N.Y. Oct. 31, 1996) (granting summary judgment after finding that a reasonable factfinder could only conclude that the plaintiff failed to make reasonable efforts to mitigate damages); *Deligiannis v. Pepsico, Inc.*, 757 F. Supp. 241, 259 (S.D.N.Y. 1991) (granting summary judgment where the plaintiff's losses were caused, as a matter of fact and law, by its unreasonable failure to mitigate).

Here, undisputed facts such as the introduction of CPTX-312 into successful products for which it was not needed, the refusal to negotiate with the party that actually owned the patent rights, the entry into a settlement agreement with the wrong party, and the voluntary forfeiture of defenses, are more than sufficient to establish a failure to mitigate as a matter of law.

**D.      CPET's conduct of the business at the time of Closing did not include selling CPTX-312 containers and did not give rise to any Losses**

BTR is also entitled to summary judgment because the amounts claimed by Owens arise

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

from Owens' own decisions and conduct after Closing, not from any activities prior to Closing.

Indemnification provisions are to be construed strictly. *Hooper Assoc., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 367 (1989) (granting defendant's motion for summary judgment and strictly construing an indemnity contract "to avoid reading into it a duty which the parties did not intend to be assumed."). "Although the words might 'seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view.' *This is particularly true with indemnity contracts.*'" *Id.* at 367 (quoting *Robertson v. Ongley Elec. Co.*, 146 N.Y. 20, 23 (1895)) (emphasis added).

In *Int'l Mineral & Chem. Corp. v. Avon Prods., Inc.*, 889 S.W.2d 111 (Mo. Ct. App. 1994) (applying New York law), the court relied on *Hooper* where a seller had agreed to indemnify the buyer for all losses incurred "as a result of . . . any contingent liability of [the subsidiary] whether or not set forth in the [Seller's] Disclosure Schedule, to the extent (but only to the extent) based on or arising out of events, acts, omissions, conditions or a state of facts occurring or existing on or prior to the Closing date." *Id.* at 115. At the time of the closing, a patent infringement suit was pending with respect to certain products being sold by the subsidiary. After closing, the buyer continued marketing and selling such products. The seller argued that it was only liable for losses that arose out of sales before closing. The court agreed, deciding as a matter of law (and reversing the lower court on this point) that the buyer was responsible for its own conduct after closing, even though in that case infringing sales had started and a lawsuit had already been filed before closing. *Avon Prods.*, 889 S.W.2d at 116.[5]

---

[5] The *Avon Products* court stated: "It is not reasonable to infer that post-closing damages were to be covered by the indemnity agreement. Under the plaintiffs' reading of this agreement, after the closing date, Mallinckrodt could intentionally infringe upon DuPont's patent with complete impunity. It could

(continued...)

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

This logic applies even more forcefully here.  In the SDA, BTR's warranty and indemnification obligation was expressly limited to the "business of the Packaging Companies as currently conducted" at the time of Closing and BTR did not assume the risk of losses arising out of Owens' subsequent business decisions.  (SDA §§3.14, 7.3(a), Conlan Decl. Ex. B).  It is undisputed that at the time of Closing, CPET had never sold a single bottle containing CPTX-312, and was actively seeking a license before doing so.  (Kerins Tr. 135:3-11, Conlan Decl. Ex. C; Ex. 9 at 3-5, Conlan Decl. Ex. J; 10, 2-3; Owens 30(b)(6) Tr., Apr. 16, 2009, 54:15-19, 76:4-77:8, Conlan Decl. Ex. H; Khetani Tr. 487:24-488:10, Conlan Decl. Ex. G).  Thus, selling containers containing CPTX-312 without a license was not part of the CPET business prior to the Closing of the SDA, and losses arising from subsequent sales of CPTX-312 are not subject to indemnification.

It is undisputed that after the Closing, Owens conducted CPET's business "differently" and began selling products containing CPTX-312 without a license.  (Khetani Tr. 440:18-441:17, 449:22-452:16, Conlan Decl. Ex. G).  Likewise, it is undisputed that CCS only claimed that infringement began in late 1998, well after Owens took over the business, and did not make any claim based on any infringement prior to Closing.  (Ex. 44 at 1, Conlan Decl. Ex. X (letter from CCS to the court stating that "[Owens/CPET] has been infringing the patent in suit since late 1998.  [CCS] filed this action in April 1999 seeking redress for that infringement."); Baehren Tr. 124:20-125:9, Conlan Decl. Ex. M ("Q:  To your knowledge, had Crown Cork & Seal ever made a claim that CPET had engaged in any infringing activity prior to shared disposition agreement

---

(...continued)

simply look to Avon for indemnity.  Mallinckrodt would control the extent of patent infringements, and the plaintiffs would reap all the profits of this conduct.  Avon, on the other hand, would bear the burden of compensating DuPont for Mallinckrodt's illegal behavior.  Certainly, the parties never intended this.  To achieve the result plaintiffs desire, we would have to ignore the clear limitation included in the indemnity clause."  *Avon Prods.*, 889 S.W.2d at 116.

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

in March of 1998? . . . A:  Not that I'm aware of."); Vellturo Tr. 65:22-66:10, Conlan Decl. Ex. S).

Most importantly, all of the damages claimed by CCS, and thus all of the "Losses" for which Owens seeks indemnification, are based on Owens/CPET's sales of infringing products beginning in 1999, and CCS never claimed damages relating to the period of BTR's ownership. (Ex. 44 at 1, Conlan Decl. Ex. X; Hoffman Report 2-5, 15, Conlan Decl. Ex. Y; Baehren Tr. 124:20-125:9, Conlan Decl. Ex. M; Vellturo Tr. 65:22-66:10, Conlan Decl. Ex. S).  As a result, any "Losses" in the CCS Matter arose from activities commenced after Closing on Owens' own initiative, and are not the liability of BTR.

Owens has argued strenuously that CPET's research activities, which involved the manufacture of small, non-commercial samples of bottles for testing purposes, constituted a technical infringement of the patents.  But that argument misses the point: it was not those activities which gave rise to any of the losses that were incurred in the CCS Matter.  Rather, the losses were entirely attributable to Owens' decision, after Closing, to sell products containing CPTX-312 without a license.

This comports with the "our watch, your watch" allocation of risk and responsibility embodied in the SDA.  There is a substantial difference between the risk of a claim of infringement from research and development activities, and the risk when an allegedly infringing product is being sold in the marketplace.  (Owens 30(b)(6) Tr., Apr. 16, 2009, 109:12-110:19, Conlan Decl. Ex. H).  Under the Patent Act, damages for infringement of a patent are limited to actual damages incurred by a party, such as lost profits, "but in no event less than a reasonable royalty." 35 U.S.C. § 284.  Thus, although research activities, including the incidental manufacture of a product for research purposes, may technically infringe a patent, they present

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

virtually no exposure for damages.  On the other hand, as soon as a product is sold, the patent

owner will almost inevitably become aware of the infringement and becomes immediately

entitled to at least a reasonable royalty on such sales.  In short, it was Owens' decision to

commence sales of containers containing CPTX-312 without a license, and not any activity that

was a part of CPET's business as it existed prior to Closing, that gave rise to all of the losses

sustained in the CCS Matter.  Owens is not entitled to any indemnification for such losses under

the terms of the SDA.

**E.**     **Owens waived any alleged breach of warranty with respect to the CCS Matter**

Prior to Closing, BTR openly disclosed to Owens the risks of selling products containing

CPTX-312 without first obtaining a license.  (Ex. 65 at OI0001515-522, Conlan Decl. Ex. D).

Owens' senior executives admit receiving, considering, and appreciating the import of this

information.  (Khetani Tr. 487:24-490:24, 516:6-517:10, Conlan Decl. Ex. G; Owens 30(b)(6)

Tr., Apr. 16, 2009, 81:6-18, Conlan Decl. Ex. H; Berkoben Tr. 18:20-19:20, Conlan Decl. Ex. F).

Under New York law, where a party closes a transaction armed with such knowledge provided

by the other party, that party can not later be heard to claim that a representation has been

breached.  *See Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992).

In *Galli,* the Second Circuit (applying New York law) analyzed whether a buyer could

claim a breach of warranty where it learned prior to closing that one of the properties he was

purchasing contained hazardous waste materials that exceeded Environmental Protection Agency

advisory levels, even though the high levels were contrary to an express warranty that had been

given in the sale agreement between the parties.  The court held that where a seller discloses to

the buyer, prior to closing, facts that would otherwise constitute a breach of its warranty, the

buyer waives its right to sue for breach of the warranty unless it expressly preserves its rights at

the time of the closing.  973 F.2d at 150-151; *see also Rogath v. Siebenmann*, 129 F.3d 261, 265

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

(2d Cir. 1997) (following *Galli* and holding that "where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer – absent the express preservation of his rights – believed he was purchasing the seller's promise as to the truth of the warranties").[6]

Here, it is undisputed that prior to Closing, BTR and CPET disclosed to Owens the risk that CPTX-312 infringed the '515 patent. Based on this disclosure, even if Section 3.14 of the SDA could otherwise be read to cover CPTX-312, Owens waived any claim for breach of Section 3.14 because by the time of Closing it could not have believed it was purchasing BTR's promise as to the truth of the warranty. To the contrary, CPET had made it clear that there was a real and substantial risk of infringement and disclosed the importance of obtaining a license under the '515 patent. (Ex. 65 at OI0001516, Conlan Decl. Ex. D; Khetani Tr. 488:20-490:24, 516:6-517:10, Conlan Decl. Ex. G). In fact, Owens has admitted that it did *not* rely on BTR, and instead conducted its own analysis of the '515 patent and CPTX-312 (though it has steadfastly blocked all discovery of this analysis). (Owens 30(b)(6) Tr., Apr. 16, 2009, 81:19-83:1, 119:18-120:2, Conlan Decl. Ex. H; Khetani Tr. 351:4-352:16, 366:17-367:23, 386:12-388:8, 499:23-501:19, 511:8-513:6, Conlan Decl. Ex. G; Baehren Tr. 9:16-11:17, Conlan Decl. Ex. M). Accordingly, Owens' claim for indemnification with respect to the CCS Matter should be dismissed as a matter of law on this ground.

---

[6] Owens attempts to argue that a general no-waiver provision in the SDA is enough to defeat New York law on this point. *See* Letter from Douglas A. Freedman of Latham & Watkins to The Honorable Louis L. Stanton, dated November 11, 2009. There is no law to support such an argument. No preservation of rights – indeed, no language on the point whatsoever – was added to the SDA after disclosure of the issue to Owens by BTR, meaning that Owens made no attempt to preserve rights with respect to the '515 patent or CPTX-312. A pre-existing, generalized "no waiver" clause does not suffice. *See Galli,* 973 F.2d at 151 (requiring a buyer to expressly preserve his rights under the warranties).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

**F.**     **Owens cannot be indemnified for its own willful infringement**

The final ground for BTR's motion for summary judgment is based on Owens' admission

that most of its settlement of the CCS Matter constituted a payment for its own willful

infringement, which is not indemnifiable under New York law. *See Austro v. Niagara Mohawk*

*Power Corp.*, 66 N.Y.2d 674, 676, 496 N.Y.S.2d 410, 411 (1985); *Biondi v. Beekman Hill House*

*Apartment Corp.*, 692 N.Y.S.2d 304, 308 (1st Dep't 1999), aff'd 94 N.Y.2d 659, 709 N.Y.S.2d

861 (2000).

Owens has acknowledged that of the $25.1 million cash settlement amount paid to CCS

for past infringement, only $5.8 million represented a royalty for infringing sales.  (Owens

30(b)(6) Tr., Apr. 16, 2009, 234:11-235:11, Conlan Decl. Ex. H; Meyer Report, attach. E.1,

Conlan Decl. Ex. Q).  All the rest of the payment – $19.3 million – was a "litigation premium" in

respect of CCS's claim for a multiple of royalties and fees based on its claim that Owens/CPET

engaged in willful misconduct.  (Owens 30(b)(6) Tr., Apr. 16, 2009, 234:11-235:11, Conlan

Decl. Ex. H).  Even if the indemnification provision of the SDA covered this payment – which it

does not – a payment for willful infringement is not indemnifiable under New York law.

In *Carlson Marketing Group, Inc. v. Royal Indem. Co.*, 517 F. Supp. 2d 1089, 1110 (D.

Minn. 2007), Carlson sued its excess insurers for coverage for expenses incurred in defending

and settling two patent infringement lawsuits.  One of the underlying actions settled after a jury

finding of willful infringement, and $5 million of the settlement damages applied to the finding

of willfulness.  *Id.*  In the subsequent coverage action, the insurer argued that the "enhanced

compensatory damages" were uninsurable because they were essentially punitive.  *Id.*  The court

held that such damages were prohibited by public policy because they were damages for willful

infringement and were therefore punitive.  *Id.* at 1112-1113 (citing *Beatrice Foods Co. v. New*

*England Printing & Lithographing Co.*, 923 F.2d 1576, 1579 (Fed. Cir. 1991)).

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

Here, although there was no express finding of willfulness, Owens itself has admitted that all payments beyond a reasonable royalty on past sales were premised on its exposure to an unindemnifiable claim of willfulness. Owens is not entitled to indemnification for the portion of its settlement payment to CCS that constitutes a payment for willfulness, and because that amount would, itself, reduce Owens' claim below the $35 million threshold, summary judgment should be granted on this ground as well.

## CONCLUSION

For the foregoing reasons, BTR respectfully requests that the Court grant its motion for summary judgment and dismiss this action.

Dated:     New York, New York
           December 14, 2009

                    PAUL, HASTINGS, JANOFSKY
                    & WALKER LLP


                    By: _____
                       Barry G. Sher (BS4252)
                       Lawrence J. Conlan (LC2170)
                       Attorneys for Defendant BTR plc
                       75 East 55th Street
                       New York, NY  10022-3205
                       (212) 318-6000


                       George L. Graff (GG8420)
                       Attorney for Defendant BTR plc
                       112 Holly Place
                       Briarcliff Manor, NY 10510
                       (914) 502-2552

*Filed Under Seal Pursuant To Stipulated Protective Order*
*Contains Confidential or Highly Confidential Information*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OWENS-ILLINOIS, INC. | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 05 CV 2873 (LLS)** |
| | ) | |
| v. | ) | |
| | ) | |
| BTR plc, | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

I, Lawrence J. Conlan, hereby certify that on December 14, 2009, a true and correct copy of the attached Memorandum of Law in Support of BTR plc's Motion for Summary Judgment in the above-captioned proceeding, was caused to be served in accordance with the Federal Rules of Civil Procedure, via email and overnight mail upon:

> Douglas A. Freedman, Esq.
> Nicholas J. Siciliano, Esq.
> Latham & Watkins, LLP
> Willis Tower, Suite 5800
> 233 South Wacker Drive
> Chicago, IL 60606
> *Attorneys for Plaintiff Owens-Illinois, Inc.*

Dated: December 14, 2009
New York, New York

PAUL, HASTINGS, JANOFSKY & WALKER LLP

By: Lawrence J. Conlan
75 East 55th Street
New York, New York 10022
(212) 318-6000
*Attorneys for Defendant BTR plc*