ⵔ **ORIGINAL**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/29/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

OWENS-ILLINOIS, INC.,

                Plaintiff,

       - against -

BTR plc,

                Defendant.

- - - - - - - - - - - - - - - - - - -X

05 Civ. 2873 (LLS)

OPINION AND ORDER

On April 30, 1998, plaintiff Owens-Illinois, Inc. ("Owens")
purchased from defendant BTR plc ("BTR") a group of food and
beverage packaging companies under a Share Disposition Agreement
dated March 1, 1998 (the "SDA"). The companies included
Continental PET Technologies, Inc. ("CPET").

The issue on BTR's motion for summary judgment is whether the
SDA requires the seller BTR to indemnify the purchaser Owens for
losses Owens sustained in connection with a patent infringement
action which was brought against CPET by Crown Cork & Seal
Technologies Corporation ("CCS" or "Crown"). Owens also seeks
indemnification for its losses from two other patent infringement
actions against CPET. However, BTR says those losses total less
than the SDA's $35 million deductible, and if Owens is not entitled
to indemnification for its losses from the CCS matter, they will be
unrecoverable.

Oral argument was heard on the record on June 25, 2010, after
which decision was reserved.

## BACKGROUND

The following facts are undisputed, except where noted.

### I.  PRE-CLOSING

In the fall of 1997, Owens was considering purchasing BTR's food and beverage packaging division, which included BTR's subsidiary, CPET. CPET is a manufacturer of plastic food and beverage containers. During Owens's due diligence of CPET, CPET disclosed to Owens its research on a new plastic packaging material: "CPTX-312," a blend of the polyamide MXD6 and the metal cobalt. CPET was researching CPTX-312 primarily for the development of the first plastic beer bottle for the United States market, which was considered a lucrative opportunity in the plastic container business. Beer had not previously been packaged in a plastic bottle in the United States because plastics in use at the time were permeable to atmospheric oxygen, which causes beer to degrade. CPTX-312 is considered an "oxygen-scavenging" barrier because it not only has low oxygen permeability but it also actively removes residual oxygen from inside the container.

CPET also disclosed to Owens that it believed that CCS, a competitor in the plastic container business, might claim that CPET's use of CPTX-312 infringed United States Patent No. 5,021,515 (the "'515 patent"). CCS had acquired the '515 patent in 1996 from its predecessor, CMB Foodcan plc, a subsidiary of Metal Box plc (collectively, "CMB"). CPET told Owens that it was in negotiations

- 2 -

with a Swedish company, PLM AB ("PLM"), for a sublicense to the '515 patent. PLM had been granted certain rights to the '515 patent under a cross-license which it had made with CMB in 1988. CPET told Owens that a sublicense to the '515 patent from PLM would be cheaper than a license from its own competitor, CCS. According to Owens, however, CPET also told it that the sublicense was not necessary to use CPTX-312 because there were valid defenses to a potential infringement claim by CCS. Bhupendra Khetani, a member of Owens's due diligence team, testified (Pl.'s Ex. 5 at 199:1-13):

. . . after that initial disclosure and up to the closing, when we did get into the patent questions or, let's say, Metal Box questions, we -- we were -- I -- I became strongly aware that their position is that, A, they have -- their work is unique, it's different, and there are legal defenses against any potential claim that they are infringing on somebody else's patents; and, B, that they had a program to get a license from PLM as a backstop just in case, just to solidify the whole position.

He later clarified (Def.'s Ex. TT at 391:15-24):

Q. And you mentioned a couple times the use of the word "backstop," the licensing discussions with -- with PLM. Did anyone from CPET use that phrase, "backstop"?

A. They did not -- I don't recall using such a phrase, but the -- the prime point of their presentation was -- was that we have solid legal defenses.

Owens claims that CPET had completed development of the CPTX-312 container by the time of the SDA. CPET showed Owens its pilot plant where it had manufactured CPTX-312 containers. CPET gave Owens projections which showed that sales of CPTX-312 beer bottles, and CPTX-312 juice bottles, were expected to start in 1999 and

- 3 -

increase in the following years. It also gave Owens a February 6, 1998 graph which showed that a beer bottle made with CPTX-312 had lower oxygen content over the prior 24-week period than four bottles made with alternative materials. CPET had obtained a Food and Drug Administration clearance opinion for the CPTX-312 container from the law firm Keller and Heckman LLP. On February 8, 1998, CPET sent a cover letter and CPTX-312 information booklet to the beer brewer Miller Brewery. CPET stated in the letter that it was sending Miller 150 "experimental bottles" for testing but that "As we are still in the development phase we cannot immediately commit to a commercialization time frame" and "I would like to have all bottle samples returned, intact, once you are finished with your evaluation." Pl.'s Ex. 32 at CPT056585.

By the time of the SDA's closing, however, CPET had never sold any containers made with CPTX-312.

## II. THE SDA AND THE CLOSING

On March 1, 1998, Owens and BTR entered into the SDA in which Owens agreed to purchase BTR's food and beverage packaging division for $3.6 billion, including CPET for $1.6 billion. In § 3.14(a) of the SDA, BTR made intellectual property representations and warranties, which were to be true as of the dates of both the SDA and the closing, that: "the Packaging Companies own, or possess licenses or other valid rights to use, all Intellectual Property necessary to operate the Packaging Business as currently conducted"

- 4 -

and that "the conduct of the business of the Packaging Companies as currently conducted does not infringe or otherwise violate any Intellectual Property of any third party except where such infringement would not have a Material Adverse Effect[1] . . . ." The "Packaging Companies" include CPET.  The SDA defines the term "Packaging Business" as used in § 3.14(a) as (SDA § 1.1):

> . . . Seller's worldwide business (including any indirect equity investment or interest therein) of manufacturing and marketing glass containers and plastic packaging and closures and the extraction, transportation, manufacture, sale and purchase of related materials and services, and related licensing and research activities as conducted from time on or prior to the date hereof . . . .

The SDA also contains an indemnification provision in § 7.3(a)(i) that BTR will indemnify Owens for "any actual Losses . . . relating to or arising out of (i) any breach of any representation or warranty made by Seller contained in this Agreement . . . ."  The SDA defines the indemnifiable "Losses" as "any actual damages, claims, losses, charges, actions, suits, proceedings, deficiencies, interest, penalties, and reasonable costs and expenses (including without limitation reasonable attorneys' and consultants' fees) . . . ."  Id. § 7.2(a).

BTR's indemnity obligation is limited, however, to Owens's Losses exceeding $35 million.  See id. § 7.3(b).

Owens and BTR closed the deal on April 30, 1998.

---

1 The SDA states that the "Material Adverse Effect" exception in § 3.14(a) is to be disregarded when determining whether BTR has breached its representations and warranties for purposes of indemnification.  See SDA § 7.3(d).

## III. POST-CLOSING

In the fourth quarter of 1998, CPET for the first time started selling plastic beer bottles made with CPTX-312. CPET under Owens's ownership also continued negotiations with PLM for a sublicense to the '515 patent.

In February 1999, CCS notified CPET that it had determined that CPET's plastic beer bottles infringe the '515 patent. CCS offered CPET a license to the '515 patent in exchange for a cross-license to CPET's own manufacturing technology. CPET rejected that offer. Later that year, CPET began selling plastic juice and ketchup containers made with CPTX-312. Juice and ketchup are not as sensitive as beer to oxygen. CPET had been selling plastic juice and ketchup containers without CPTX-312 since the early 1990s, using an alternative oxygen barrier, "EVOH" (ethyl vinyl alcohol). Owens contends, however, that CPTX-312 yields benefits even for use in juice and ketchup containers.

On April 8, 1999, CCS filed a patent infringement action against CPET in the United States District Court for the District of Delaware.[2] It claimed that CPET "has been and still is infringing" the '515 patent "by making, offering for sale and/or selling, in the United States, plastic bottles having walls that are capable of scavenging oxygen." Pl.'s Ex. 48 ¶ 7. CCS claimed that CPET's infringement was willful and sought treble damages.

_____

2 In 2002, CCS assigned the '515 patent to Constar International, Inc., which was substituted for CCS as the plaintiff in the Delaware District Court. They will be referred to collectively as "CCS" in this opinion.

- 6 -

CPET continued negotiations with PLM for a sublicense to the '515 patent until March 2000. According to Owens, at that time PLM abruptly told CPET that Chevron Research and Technology Company and its affiliate (collectively, "Chevron") actually had the exclusive rights to grant a sublicense to the '515 patent for CPET's CPTX-312 containers pursuant to a 1993 license agreement among Chevron, PLM, and CMB. The 1993 license agreement had granted Chevron rights to the '515 patent for certain defined "Material" and "Products."

Chevron was already a resin supplier to Owens. Owens asserts that it contacted Chevron, and Chevron confirmed that it, not PLM, had the exclusive rights to grant a sublicense to the '515 patent for CPET's CPTX-312 containers. Owens further contends that Chevron agreed to bear the costs of litigating with CCS over the validity of a sublicense from Chevron. In May 2000, Chevron intervened in the CCS matter and asserted a claim against CCS to determine their respective rights to the '515 patent under the 1993 license agreement. Chevron also asserted a patent infringement claim against CPET, and on August 29, 2000, CPET and Chevron entered into a settlement agreement and a sublicense agreement in which CPET agreed to pay Chevron royalties under the '515 patent. Owens explains (Pl.'s Opp. 60, emphasis in original):

> In order to effectuate that license as a defense to CCS in the ongoing litigation, it was necessary to enter into a license arrangement that protected against all infringement claims by CCS. Thus, the license needed to cover both actions *going forward* (the sublicense agreement), as well as account for activity *in the past*,

- 7 -

including activity undertaken while BTR owned CPET (the "settlement").

CPET started paying royalties to Chevron and marking its CPTX-312 containers as "Licensed Under U.S. Patent No. #5,021,515."

On November 14, 2000, the Delaware District Court stayed CCS's infringement claim against CPET, while CCS and Chevron litigated their respective rights to the '515 patent under the 1993 license agreement.

On March 6, 2001, Owens sent BTR a letter notifying BTR of CCS's claim (and of the sublicense with Chevron) under § 7.4 of the SDA, which states in part:

In the event that any written claim or demand for which an Indemnifying Party may be liable to any Indemnified Party under this Article VII (a "Claim") is asserted against or sought to be collected from any Indemnified Party by a third party, such Indemnified Party shall as promptly as practicable notify the Indemnifying Party in writing of such Claim . . . (the "Claim Notice") and the following provisions shall be applicable. The failure on the part of the Indemnified Party to give any such Claim Notice in a reasonably prompt manner shall not relieve the Indemnifying Party of any indemnification obligation hereunder except to the extent that the Indemnifying Party is materially prejudiced thereby.

The SDA gives BTR the right to control the defense of a "Claim." However, BTR never sought to participate in the CCS matter in any way.

After a five-day bench trial in July 2001, on November 25, 2002, the Delaware District Court held that the 1993 license agreement did not give Chevron the rights to grant a sublicense to the '515 patent for CPET's CPTX-312 containers and that the rights

- 8 -

were retained by CCS. See Crown Cork & Seal Tech. Corp. v. Cont'l
PET Techs., Inc., 232 F. Supp. 2d 294 (D. Del. 2002). On June 25,
2003, that court ordered CPET and CCS to resume litigation of CCS's
infringement claim.

On October 31, 2004, before any dispositive motions were made,
CPET and CCS finally resolved the CCS matter by entering into a
settlement agreement in which CPET agreed to pay CCS $25.1 million
and a license agreement in which CPET agreed to pay CCS royalties
under the '515 patent.

Owens claims that it incurred total losses of approximately
$39 million from the CCS matter, including the $25.1 million
settlement with CCS, approximately $10 million in other costs and
attorneys' fees from defending against CCS's infringement claim,
and approximately $2.9 million in unreimbursed royalties which CPET
had paid to Chevron.  CPET had paid Chevron royalties totaling
approximately $5 million, but Chevron reimbursed CPET for all but
the approximately $2.9 million that Owens now seeks from BTR.

BTR moves for summary judgment that the SDA does not entitle
Owens to indemnification for any of those losses.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment
"should be rendered if the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no genuine
issue as to any material fact and that the movant is entitled to

judgment as a matter of law." "This standard requires that courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted).

The SDA is governed by New York law.

## I. INTELLECTUAL PROPERTY REPRESENTATIONS AND WARRANTIES

CCS's complaint claimed that CPET infringed the '515 patent "by making, offering for sale and/or selling, in the United States," CPTX-312 containers. Pl.'s Ex. 48 ¶ 7. Owens and BTR disagree about whether the SDA entitles Owens to indemnification for those losses which arise out of CCS's claim for CPET's infringing sales of CPTX-312 containers. The issue is whether BTR's intellectual property representations and warranties in § 3.14(a) of the SDA covered CPET's sales of CPTX-312 containers, since those sales did not start until after the closing. Owens acknowledged at oral argument that if BTR's intellectual property representations and warranties did not cover CPET's post-closing sales of CPTX-312 containers, then Owens's remaining claims for indemnification are unrecoverable, as they do not exceed Owens's $35 million deductible. Neither party argues that the SDA is ambiguous.

The scope of BTR's intellectual property representations and warranties in § 3.14(a) of the SDA is limited to "all Intellectual

- 10 -

Property necessary to operate the Packaging Business as currently conducted" and "the conduct of the business of the Packaging Companies as currently conducted."  Owens argues that although CPET never sold any CPTX-312 containers by the time of the closing, sales of CPTX-312 containers were then part of CPET's business "as currently conducted" because CPET had completed development of the CPTX-312 container by the time of the closing and both sides contemplated that sales of CPTX-312 containers would be a major component of CPET's growth.  Mr. Khetani testified (Pl.'s Ex. 5 at 380:19-381:23):

> Q.   Did they say that, their work is done?
>
> A.   Absolutely.  This is -- Miller is testing it, and it has got this 24-week shelf life.  Here are the data.  We have got an oxygen measuring system, ORBIS 3 . . . or something they called it, that does it.  We have the process lined up.
>         There is some company in Switzerland with some operation machine or something that is making it or can make it.  We are also making a pilot plant and using it in the injection process.
>
> . . . .
>
>         So this was a real thing -- of our mind, it was a part of the business spectrum that we are buying, ready to go.

Owens's understanding that CPTX-312 containers were "a part of the business spectrum" and "ready to go" shows that sales of CPTX-312 containers were expected to start soon.  But § 3.14(a)'s clear limitation to CPET's business "as currently conducted" cannot reasonably be interpreted to include CPET's sales of CPTX-312

containers. Those did not start until after the closing. The projections that CPET gave Owens during due diligence did not show sales of CPTX-312 containers starting until 1999, over eight months after the closing. Under New York law, "Where the contract is unambiguous, courts must effectuate its plain language." Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir. 2002). BTR represented and warranted only the intellectual property for CPET's business "as currently conducted." Since BTR's representations and warranties were to be true as of the dates of both the SDA and the closing, the word "currently" fixes a cutoff date, the April 30, 1998 closing, by which the scope of CPET's business is measured. It is generally understood that when an activity is "conducted" it is actually carried out. See, e.g., Concise Oxford English Dictionary 298 (11th ed., rev. 2008) (defining the verb "conduct" as "organize and carry out"). Owens offers no specialized definitions which might be applicable. While CPET had conducted manufacturing and research by the time of the closing in anticipation of future sales of CPTX-312 containers, the future sales themselves were not conducted by the time of the closing. Thus, the plain language in § 3.14(a) did not cover CPET's anticipated post-closing sales of CPTX-312 containers.

Other language in the SDA also supports the conclusion that § 3.14(a) did not cover future sales of CPTX-312 containers. The first clause in § 3.14(a) concerns CPET's "Packaging Business."

- 12 -

The SDA defines the term "Packaging Business" as "manufacturing and marketing glass containers and plastic packaging and closures and the extraction, transportation, manufacture, sale and purchase of related materials and services, and related licensing and research activities as conducted from time to time on or prior to the date hereof . . . ."  SDA § 1.1.  It does not include plastic containers in its Packaging Business definition, and sales of those containers which did not start until after the closing cannot be described as having been "on or prior to" the date of the SDA.

Owens argues that exclusion of the anticipated post-closing sales of CPTX-312 containers from BTR's intellectual property representations and warranties would have been "contrary to common sense" because CPET had prepared for the sales and the parties understood that CPTX-312 sales were important to CPET's growth.  Pl.'s Opp. 56.  But placing the risk of loss from the future sales on Owens is consistent, since Owens would control the extent of those sales and reap all the profits therefrom.  Further, Owens would receive the benefit of the anticipated cheap sublicense to the '515 patent from PLM, reducing its risk of loss or of an injunction from a potential infringement claim.

Owens also points out that CPET's business "as currently conducted" by the time of closing included the manufacture of CPTX-312 containers and argues that "Because BTR promised that the manufacture (*i.e.*, the 'making') of CPTX-312 bottles did not

- 13 -

infringe CCS's '515 patent, then BTR necessarily promised that the sale of CPTX-312 bottles did not infringe CCS's '515 patent." Id. at 55. It relies on the fact that the Patent Act, 35 U.S.C. § 271(a), prohibits both the unauthorized manufacture and sale of a patented invention in the United States.    "But in New York indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a clear and unmistakable intent to indemnify." Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993) (internal quotation marks omitted); see also Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491 (1989) ("When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed."). Sales are a distinct activity from manufacturing, with different consequences.    Sales increase exposure to infringement liability because they create revenue from the infringement and involve other users of the infringing product.    See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (factors to consider for determining damages from patent infringement include "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use" and "the benefits to those who have used the invention"), modified sub nom. Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295

- 14 -

(2d Cir. 1971). Thus, an obligation to indemnify for losses from sales does not automatically follow from a promise to indemnify for losses from manufacturing.

Accordingly, sales of CPTX-312 containers were not part of CPET's business "as currently conducted" for purposes of BTR's intellectual property representations and warranties in § 3.14(a) of the SDA, and the SDA does not entitle Owens to indemnification for those losses which arise out of CCS's claim for CPET's infringing sales. Because Owens's remaining claims for indemnification amount to less than the $35 million deductible under the SDA, judgment will be entered for BTR dismissing the claimed indemnity.

BTR's other arguments for its motion raise genuine issues of material fact, and would not support summary judgment in its favor.

**II.  LATE NOTICE**

BTR argues that Owens has no right to indemnification under the SDA because of Owens's delay in notifying BTR of the CCS matter until March 6, 2001. Owens admits that it "did not provide notice of the CCS Matter to BTR as promptly as practicable" as required by § 7.4 of the SDA. Pl.'s Rule 56.1 Resp. No. 55.

Under § 7.4 of the SDA, Owens's late notice does not relieve BTR of any indemnification obligation "except to the extent that the Indemnifying Party is materially prejudiced thereby."

BTR argues that it was prejudiced by Owens's late notice in

- 15 -

the following three ways.

1.  BTR asserts that CPET made a prejudicial decision not to settle with CCS during the time period before BTR was on notice and that CPET "pursued, instead, a 'burn all bridges' strategy of expensive litigation for five years" and that "early settlement would have avoided the nearly $10 million in legal fees that were expended in defense against CCS's claims" and "virtually all the infringing sales."  Def.'s Reply 6.

The evaluation of that assertion involves resolution of a series of factual matters which are inappropriate for determination by summary judgment.  For example, after it was placed on notice, BTR never sought to participate during the three and a half years before CPET reached its settlement with CCS on October 31, 2004. During that time, CPET made the bulk of its sales of allegedly infringing juice and ketchup bottles, and CPET claims it incurred more legal fees in 2003 and 2004 than it did from 1999 through 2002.  Nor is it evident that intervention by BTR could have achieved an earlier or cheaper settlement.  Owens asserts that, through the date it gave BTR notice, CCS - CPET's competitor in the plastic container business - would only settle for a cross-license to CPET's proprietary manufacturing technology, which was an unreasonable demand.  Owens's witness, Howard Bruss, testified (Def.'s Ex. H at 238:18-239:7):

> The demand of Constar, Crown, early in the litigation to Mr. Berkoben the requirement [sic] was that there be multilayer technology licensed from CPET to

Crown and CPET had just been purchased at -- just been purchased from BTR and one of the driving factors was the technology. They wanted that sequential injection technology which was the crown jewel.

So it made no economic sense to give up the crown jewel almost immediately after the closing and so that price they were demanding was out of -- was out of bounds and so there was no basis for settlement until Crown asked for a cash settlement and negotiation.

He also stated that (Pl.'s Ex. 8 at 222:18-223:10):

Q. What happened in the spring of '04 that led you to enter into those settlement negotiations?

A. . . . By that time they had dropped their demand for the multilayer technology that had been the stumbling block in the past. That was the crown jewel of the CPET acquisition and that's why negotiations never began earlier with Russ or through the course of the case because they wanted the multilayer technology.

BTR does not dispute that a settlement which included CCS's demand for CPET's proprietary manufacturing technology would have been unreasonable and, under § 7.4 of the SDA, BTR could not have required CPET to accept it.[3]  It was at BTR's suggestion that CPET was pursuing a sublicense from PLM, which would be cheaper than settlement with CCS.

2.  BTR also argues that CPET made a prejudicial decision to start selling CPTX-312 juice and ketchup containers after CCS had advised CPET of its infringement claim in February 1999, while CPET previously had only been selling CPTX-312 beer bottles.  BTR claims

---

3 Section 7.4 of the SDA states, in relevant part:

. . . an Indemnified Party shall not be required to consent to any settlement or judgment which . . . (ii) involves the imposition of equitable remedies, the imposition of any material obligations on or the waiver or compromise of any material rights of such Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder.

that those juice and ketchup sales "ended up causing 90% of all the damages in the CCS Matter (all of which Owens now seeks to charge to BTR)." Def.'s Mem. 22.

For similar reasons, there are factual issues whether (and if so, when) BTR would have intervened to prevent CPET's sales of CPTX-312 juice and ketchup containers. BTR had projected such sales of juice containers by itself to start in 1999, and anticipated obtaining the sublicense to the '515 patent from PLM, for which negotiations were ongoing. BTR does not suggest any way of quantifying a dollar amount by which Owens's indemnity claim would be reduced by BTR's having had an earlier opportunity to stop those sales - which indeed continued long after it received notice.

3. Finally, BTR contends that CPET's settlement and sublicense with Chevron also relieves BTR of any duty to indemnify for the $25.1 million settlement with CCS and the approximately $10 million in legal fees from the defense of CCS's claim. It argues that the settlement and sublicense with Chevron had the effect of "publicly admitting that [CPET's] products infringed the '515 patent and voluntarily forfeiting [CPET's] defenses to CCS's claim." Id. 22-23 (alterations added). In particular, BTR argues that CPET's conduct of marking its CPTX-312 containers as "Licensed Under U.S. Patent No. #5,021,515" estopped CPET from later asserting non-infringement or invalidity defenses to CCS's claim.

Evaluation of this contention is speculative, however.

- 18 -

Notwithstanding its settlement with Chevron and its license-marking, CPET continued to assert non-infringement and invalidity defenses to CCS's claim.

### III. MITIGATION

BTR argues that by starting to sell CPTX-312 juice and ketchup containers after CCS had advised CPET of its infringement claim and by entering into the settlement and sublicense with Chevron, CPET also failed to mitigate its losses under § 7.3(c)(i) of the SDA, which states:

> Notwithstanding anything to the contrary in this Agreement, an Indemnifying Party shall not be liable for any Losses:
>
> (i) where the Losses suffered by any Purchaser Indemnified Party . . . are the result of or in consequence of any failure by such Indemnified Party to take reasonable and prudent action to mitigate any Losses . . . .

The question reduces itself into whether CPET's proceeding with its sales of the allegedly infringing bottles was reasonable under the circumstances. That is a jury question because the circumstances included the expectations concerning the sublicense from PLM, the evaluation of the patent defenses, and the reasonableness of CPET's belief that Chevron had the rights to sublicense. That last point was not clear-cut. Rather, it involved an application of English law to the 1993 license agreement and reliance on expert testimony and scientific tests to determine whether one of the ingredients in CPTX-312, the polyamide

- 19 -

MXD6, has sufficient structural integrity to constitute a "structural polymer" as that term was used in the definition of "Material" to which Chevron was granted rights under the 1993 license agreement. See Crown Cork & Seal Tech. Corp., 232 F. Supp. 2d at 303-05.

Owens submits evidence that CPET was justified in believing that Chevron had the rights based on the information reasonably available to CPET when it made the settlement and sublicense with Chevron. According to Owens, after lengthy negotiations with PLM, PLM told CPET that Chevron actually had the rights to grant a sublicense to the '515 patent for CPET's CPTX-312 containers. Russell Berkoben, a member of Owens's due diligence team, testified (Def.'s Ex. 6 at 47:18-48:7):

> Q. When did PLM first tell you that they didn't have the right to license the technology that you had been negotiating about for, at least a year is what you described?
>
> A. I can't remember the exact date, but I know it was after a substantial lengthy negotiation. It might have been well in excess of a year.
>
> Q. What did they tell you specifically in that regard?
>
> A. They told us that Ulf Graden, who was their attorney, because I can still remember this meeting to this day, came to Toledo and sat down in a conference room like this and said, We're sorry, but you need to talk to Chevron. They have the rights. We don't have the rights.

When Owens contacted Chevron, Chevron confirmed that it had the rights. Mr. Berkoben testified that Owens believed that

Chevron had the rights because (id. at 99:3-16):

> What I recall is the way Ulf explained it to us, it
> was very clear. To our sense, PLM had all the reason in
> the world to want to work something out with us. So if
> they didn't have the rights, they wouldn't just make up a
> story that Chevron had the rights. We also had a strong
> business relationship with Chevron as a resin supplier.
> The business contact there that I knew, I think a fellow
> by the name of Jeff Kaler, so somebody in the business
> side of Chevron told us that they had those rights. So
> we felt -- you know, we trusted. They were a good
> supplier to us. We didn't think they would have any
> incentive to mislead us or lie to us.

Owens also asserts that Chevron gave additional comfort that
it had the rights because "Chevron put its money where its mouth
was: understanding that CCS likely would object to a license from
Chevron to CPET . . . Owens and CPET insisted, **and Chevron agreed**,
that Chevron would bear the entire costs and burden of litigating
any resulting license dispute against CCS." Pl.'s Opp. 29
(emphasis in original). Chevron followed through, at least in
part, by intervening in the CCS matter and, after the Delaware
District Court held that its sublicense was invalid, reimbursing
CPET for approximately $2.1 million of the $5 million in royalties
that CPET had paid to Chevron.

The reasonableness of the parties' actions, under the
circumstances prevailing at the time, is a jury question.

**IV. WAIVER**

BTR argues that Owens waived any representations and
warranties in the SDA that CPET's use of CPTX-312 did not infringe
the '515 patent because "prior to Closing, BTR and CPET disclosed

- 21 -

to Owens the risk that CPTX-312 infringed the '515 patent." Def.'s Mem. 30.

This argument involves two factual issues. The first is whether Owens, despite BTR's disclosures, reasonably believed it was purchasing BTR's warranty that notwithstanding the risk, the patent defenses were good, and BTR's promise of indemnity if the defenses failed. The second involves the clarity and degree of BTR's disclosures. The resolution of both points depends upon recollection and evidence of conversations inappropriate for summary judgment.

## V. WILLFUL INFRINGEMENT

BTR argues that $19.3 million of the $25.1 million settlement with CCS was compensation for willful infringement for which Owens is not entitled to indemnification as a matter of New York public policy.

CCS's complaint included a claim for willful infringement. However, CPET's settlement agreement with CCS does not say how the $25.1 million settlement was calculated or whether it included any allowance for the claimed willful infringement. BTR argues that CPET and CCS calculated the $25.1 million figure by applying the royalty rates in their license agreement for future use ($3 per thousand containers for beer and flavored malt beverages and $1 per thousand containers for all other uses) to CPET's past sales, which would yield royalties of only $5.8 million, and that the remainder

of the $25.1 million was compensation for willful infringement.  It

relies on the following testimony of Mr. Bruss (Def.'s Ex. H at

234:11-236:2):

     Q.   The question is how you came to this $25
million figure if the royalty going forward was
reasonable at $1 million for non-food -- for food and
juice and $3 per thousand for beer?

   .   .   .   .

     A.   The $25 million obviously includes a litigation
premium or the settlement value.

   .   .   .   .

     Q.   Wasn't the basis of their damages claim a
reasonable royalty?  Wasn't that the only basis for their
damages claim?

     A.   That was their basis, yes.

     Q.   Why would they be entitled to anything in
settlement over and above a reasonable royalty?

     A.   Because their case as they explained they were
going to bring it where they were going to seek treble
damages and fees for willfulness which gets it over $200
million.

   .   .   .   .

     Their damage claim of their expert was ten
percent as their reasonable royalty and that's where they
came out with the $63 million.
     Now the settlement is a number 25 million which
if you straight extrapolate that, it's three, four
percent or whatever it is and that includes the
litigation premium for their effort to bring the case
rather than just signing a license and saying going
forward it's this $3 and $1, they extracted a litigation
premium for the litigation because they are giving up
their claim to go after the 200 plus million.

Mr. Bruss stated elsewhere that $25.1 million is three or four

- 23 -

percent of CPET's past sales, but that it also includes a "litigation premium." The calculation of the litigation premium is left mysterious, and furnishes no basis for summary judgment about any degree of allowance for willfulness in the $25.1 million settlement amount.

## CONCLUSION

BTR's motion for summary judgment that the SDA does not entitle Owens to indemnification is denied, except that it is granted with respect to those losses which arise out of CCS's claim for CPET's infringing sales of CPTX-312 containers. Since Owens's remaining claims for indemnification do not exceed the SDA's $35 million deductible, the complaint is dismissed, with costs to BTR according to law.

The Clerk is directed to enter judgment accordingly.

Jurisdiction over this case is retained to resolve any issues regarding the unsealing of the parties' summary judgment motion papers.

So ordered.

Dated: New York, New York
       June 28, 2010

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.

- 24 -